UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW BESSER, | ) | CASE NO.  1:22-cv-2150 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| DEPUTY JUSTIN ADY, *et al.*, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 29.)  Plaintiff

opposed (Doc. 35) and Defendants replied (Doc. 37).  For the reasons below, Defendants'

Motion is GRANTED.

I.     **BACKGROUND**

A.     **Undisputed Facts**

Craig Wright ("Wright") and his wife, Mrs. Wright ("Mrs. Wright") married in 2005.

(Doc. 27-13 at 647.)[1]  Both had children from prior relationships.  (*Id.* at 648.)  When they

married, Mrs. Wright's two children lived with the couple full time.  (*Id.*)  Wright had partial

custody of his three children who resided with the family three days a week.  (*Id.*)  By 2020, their

children moved out and Wright and Mrs. Wright lived alone.

On December 3, 2020, Mrs. Wright confronted Wright about an allegation he sexually

abused a child.  (*Id.* at 676.)  Mrs. Wright demanded a divorce.  (*Id.* at 673.)  She then gathered

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document
and PageID# rather than any internal pagination.

some of her essential papers and took them to her daughter's house for safekeeping.  (*Id.* at 679.)

After Mrs. Wright left, Wright texted with his children about the argument and allegations.  (Doc. 27-10; Doc. 27-11; Doc. 27-12.)  The texts contained suicidal ideations and Wright refused to answer any calls.  (Doc. 27-10; Doc. 27-11; Doc. 27-12.)  One of Wright's children called the Richland County Sheriff's Office ("RCSO") and requested a wellness check.  (Doc. 27-8 at 571.)  The caller told dispatch Wright may be suicidal.  (*Id.*)

Deputies Justin Ady and Michael Pawlikowski (separately "Deputy Ady" or "Deputy Pawlikowski" and together "the deputies") responded to the call.  (Doc. 27-1 at 144–45.)  The dispatcher told them the individual threatened suicide.  (*Id.* at 146.)  Deputy Ady knocked on the Wrights' door without answer.  (*Id.* at 148.)  Mrs. Wright arrived home while the deputies were waiting.  (*Id.*)  Deputy Ady explained they were there to check on Wright and asked to be let inside.  (*Id.*)  Mrs. Wright agreed.  (*Id.*)  Deputy Ady turned on his body camera and entered the house.  (*Id.* at 151.)[2]

Once inside, the deputies went upstairs.  (Doc. 36 at 23:16:50.)  Deputy Ady led the way.  (*Id.*)  They reached the top of the stairs and turned left towards a bedroom.  (*Id.* at 23:16:53.)  Wright came out of that bedroom as the deputies reached the top of the stairs.  (*Id.* at 23:16:58.)  Wright appeared intoxicated.  (Doc. 27-1 at 155; Doc. 27-2 at 279–80.)  Wright said he would not talk and they should leave.  (Doc. 36 at 23:17:00–23:17:10.)  He waived the deputies off.  (*Id.*)  Wright turned to go back into the bedroom.[3]  (*Id.* at 23:17:10.)

---

[2] Deputy Pawlikowski's body camera was not operational.  (*Id.* at 152.)  As a result, Deputy Ady's body camera is the only recorded footage of the incident.  Plaintiff provided the Court with a manual filing of the body camera footage from Deputy Ady.  (*See* Doc. 36.)  The body camera footage will be cited as "Doc. 36" hereinafter with specific citations to the timestamp, as necessary.

[3] For context, the bedroom was at the end of a short hallway.  When walking up the stairs, to get to the bedroom, one would turn left, walk down the hallway, and then turn left into the bedroom.

To prevent Wright from entering the bedroom, Deputy Ady grabbed his right arm.  (*Id.* at 23:17:17.)  Wright attempted to pull his arm away.  (*Id.* at 23:17:18.)  Deputy Ady conducted a takedown maneuver to prevent Wright from moving further into the bedroom.  (Doc. 34-4 at 1726.)  The takedown maneuver resulted in Wright falling on the bed with Deputy Ady falling on top of him or just to the side of Wright.  (Doc. 36 at 23:17:19.)  While on the bed, Deputy Ady's body camera was obscured for approximately thirteen seconds because the camera was close to Wright and the bed.  (*Id.* at 23:17:21–34.)  During that time, the sounds of a struggled ensued.  (*Id.*)  While the camera was obscured, Deputy Pawlikowski entered the room and started to move towards the far end of the bed because Deputy Ady was between himself and Wright.  (Doc. 27-2 at 284.)  Deputy Ady continued to struggle with Wright and can be heard on the body camera footage indiscernibly and frantically shouting.  (Doc. 36 at 23:17:21.)  Approximately ten seconds after the body camera became obscured, a gunshot can be heard followed by more sounds of a struggle.  (*Id.* at 23:17:22.)  The bullet struck Deputy Pawlikowski in the right arm by the elbow, shattering two bones and rendering him unable to move his arm.  (Doc. 27-2 at 285–87.)  Deputy Pawlikowski dove to the far side of the bed after being shot.  (*Id.* at 288.)

Seconds later, Deputy Ady rose to his knees on the bed, straddling Wright, who was now laying chest down.  (Doc. 36 at 23:17:33–37.)  The unobscured body camera shows Deputy Ady striking Wright in the back of the head with the butt of a gun, later identified as Wright's gun.  (*Id.*)  Deputy Ady threw the gun towards the end of the bed and drew his service weapon.  (*Id.* at 23:17:38.)  Deputy Pawlikowski left the room.  (*Id.* at 23:17:43.)  As he left, Deputy Pawlikowski picked up Wright's gun and threw it into the hallway.  (Doc. 27-2 at 290–91.)

---

Looking into the bedroom from the door, there was a bed positioned in the middle of the room with the head flush against the right wall.  There was space on either side and at the foot of the bed.  Nothing obstructed the deputies from entering the room.  (*See* Doc. 32-7 at 1215–16.)

Deputy Ady backed away from Wright, backed up to the doorway, and communicated with dispatch.  (Doc. 36 at 23:17:44–50.)

For approximately 30 seconds, Wright appeared to be unconscious.  (*Id.* at 23:17:50–23:18:19.)  Wright then started to slightly move and spoke to the deputies.  (*Id.* at 23:18:19.)  Deputy Ady commanded Wright not to move.  (*Id.*)  Wright can be heard stating "Kill me" multiple times while still on the bed.  (*Id.* at 23:18:24–23:19:15.)  Deputy Ady continued to command Wright not to move and to relax.  (*Id.* at 23:19:00–23:19:38.)  Deputy Ady continued to communicate with backup and talked with Deputy Pawlikowski—who was positioned behind him—to make sure he was safe.  (*Id.* at 23:18:24–23:19:30.)  Wright remained on the bed for approximately one and a half minutes after starting to talk to Deputy Ady.  (*Id.* at 23:19:00–23:20:25.)  Deputy Ady continued to give commands and tried to explain to Wright they were there to help him.  (*Id.* at 23:20:06.)

Despite Deputy Ady's commands, Wright kneeled on the far side of the bed, repeatedly asking to be killed.  (*Id.* at 23:20:25.)  After Wright kneeled on the bed, Deputy Ady and Wright were approximately five to seven feet away from each other.  (Doc. 27-5 at 435.)  It is undisputed the gun was not in the bedroom at this point.  However, Deputy Ady believed the gun was between himself and Wright where he initially threw it.  (Doc. 33-13 at 1480–81.)  Deputy Ady testified that he believed—or rather "knew"—the gun was in the bedroom and that Wright was looking at the gun.  (Doc. 27-1 at 141.)

The incident continued to unfold.  Deputy Ady repeatedly commanded Wright to not move and to stop talking.  (Doc. 36 at 23:20:30–23:20:46.)  Wright continued talking and screaming for Mrs. Wright while Deputy Ady continued to tell Wright they were going to get him help.  (*Id.* at 23:20:46.)  In response, Wright yelled "f--- you" and raised his middle finger.

(*Id.*)  The two continued to speak back and forth.  (*Id.* at 23:20:46–23:21:06.)  Wright again raised his middle finger at Deputy Ady.  (*Id.* at 23:21:08.)  Deputy Pawlikowski—who was able to put his tourniquet on and was standing behind Deputy Ady—commanded Wright to comply.  (*Id.*)  For the third time, Wright raised his middle finger at Deputy Ady after he repeatedly commanded Wright to get on the ground.  (*Id.* at 23:21:29.)  Wright continued yelling for Mrs. Wright and claimed he did not touch her children.  (*Id.* at 23:21:39–23:21:47.)  Deputy Ady continued to tell Wright to relax and that they were not accusing him of anything.  (*Id.*)  Wright repeatedly said "no, no, no" and pointed to his chest, telling Deputy Ady to "shoot me right here."  (*Id.* at 23:22:01.)

After calling for Mrs. Wright again, Wright stood up from his kneeling position on the bed.  (*Id.* at 23:22:22.)  Deputy Ady commanded him to stop moving, but Wright continued to get up.  (*Id.* at 23:22:25.)  Wright fully stood up and positioned himself so that he was in the space between the bed and the wall with nothing between Deputy Ady and himself.  (*Id.* at 23:22:34.)  He again told Deputy Ady to shoot him.  (*Id.*)  Wright inched a few times towards Deputy Ady.  (*Id.* at 23:22:39.)  Deputy Ady told Wright to relax multiple more times.  (*Id.* at 23:22:48–23:22:50.)  Wright replied "Nope. I'm not going to jail" and stepped towards Deputy Ady.  (*Id.* at 23:22:52.)  Deputy Ady fired his service weapon five times.  (*Id.* at 23:22:52–23:22:54.)  The bullets struck Wright in the chest.  (*Id.*)  Deputy Pawlikowski, who was still behind Deputy Ady, had his taser drawn when Deputy Ady fired his weapon.  (*Id.* at 23:22:54.)  Wright collapsed and the deputies attempted to handcuff him.  (*Id.* at 23:23:14.)  Other officers arrived moments later, and Deputy Ady and Deputy Pawlikowski left the home.  (*Id.* at 23:24:15.)  Wright passed away after being transferred to a hospital.  (Doc. 32-4 at 1206.)

Immediately after the shooting, RCSO contacted the Bureau of Criminal Investigation

("BCI"), an arm of the Ohio Attorney General's office, to conduct an independent investigation. (*Id.* at 1154.)  Special Agent Chuck Moran from BCI was assigned the investigation and arrived on scene.  (*Id.* at 1156.)  The resulting BCI report detailed the events, including the collection of evidence and a second-by-second breakdown of the shooting.  (Doc. 34-2.)

Also following the shooting, Captain James Sweat ("Captain Sweat") of RCSO conducted an internal investigation and review of the shooting.  (Doc. 27-5 at 406.)  Per RCSO policy, when the use of force results in severe or deadly injury, investigations are presented to the Use of Force Review Board (the "Board") which makes recommendations to the Sheriff.  (*Id.* at 398, 400–01.)  The Sheriff ultimately decides whether any laws or policies were violated by the action.  (*Id.* at 400–01.)  As part of his investigation, Captain Sweat interviewed Deputy Ady and Deputy Pawlikowski.  (*Id.* at 409–10.)  Captain Sweat also reviewed and collected information from the BCI report.  (*Id.* at 409.)  All investigative materials were presented to the Board.  (*Id.*)  As a result of the investigation, the Board found Deputy Ady's use of force objectively reasonable, that no known statutes were violated, that no Sheriff's Office policies were violated, and that there was clear and effective training.  (Doc. 34-14 at 1855.)  Sheriff Steve Sheldon followed the Board's recommendation.  (Doc. 33-15.)

Lastly, as part of the internal investigation and pursuant to RCSO policy, anytime a deputy uses force, the deputy must fill out a "Use of Force" report as soon as practicable.  (Doc. 27-5 at 443.)  Deputy Ady and Deputy Pawlikowski filled out such reports (or a proxy did with their assistance).  (Doc. 34-5; Doc. 34-6.)  Both use of force reports largely referenced the investigative report for details about the incident because, as Captain Sweat explained, an investigation would follow such that multiple reports would not be necessary.  (Doc. 27-5 at 451.)  The dates on the use of force reports indicate they were filled out prior to the

investigation's completion.  (Doc. 34-5; Doc. 34-6.)

### B.    Alleged Disputed Facts

Plaintiff asserts there is a disputed fact relating to how the gun was fired during the initial struggle between Wright and Deputy Ady on the bed leading to Deputy Pawlikowski's injuries. (Doc. 35 at 1870.)  In his deposition, Deputy Ady testified after Wright fell onto the bed, Wright reached for a gun that was underneath the pillow.  (Doc. 27-1 at 159.)  Deputy Ady explained Wright was able to position himself such that he was facing Deputy Ady, as Deputy Ady attempted to get on top of Wright.  (*Id.* at 162–63.)  The two fought for the gun, but during the struggle, Wright was able to shoot.  (*Id.* at 163.)  Within seconds after the gunshot, Deputy Ady testified he took the gun from Wright's hand and pushed Wright over so that he was lying face down.  (*Id.* at 164–65.)  When Deputy Ady wrestled the gun from Wright, and the body camera footage becomes unobscured, Deputy Ady can be seen striking Wright with the butt of the gun. (Doc. 36 at 23:17:33–37.)

Plaintiff provides an alternative narrative of the events that transpired when the body camera footage was obscured.  Plaintiff does not dispute a gun was on the bed.  (Doc. 35 at 1869–70.)  Plaintiff also does not dispute the gun discharged while Deputy Ady and Wright struggled on the bed.  (*Id.* at 1869.)  And Plaintiff does not dispute the shot struck Deputy Pawlikowski in the arm.  (*Id.*)  However, Plaintiff claims there is no evidence Wright grabbed the gun and fired the shot.  (*Id.* at 1870.)  Instead, Plaintiff claims it is more likely the gun accidentally discharged while Deputy Ady and Wright were on the bed.  (*Id.*)  Plaintiff concludes this is the "most likely explanation for the gunshot," pointing to a few pieces of evidence.  (*Id.*) For instance, the BCI report nor the internal investigation concluded Wright shot the gun.  (Doc. 31-1 at 1035.)  Further, Deputy Pawlikowski also testified he never saw Wright shoot the gun.

(Doc. 27-2 at 285.)  More pointedly, Plaintiff states Deputy Ady's version of the events is not plausible because Wright was likely positioned face down during the entire encounter on the bed. (Doc. 35 at 1869.)

Plaintiff also asserts factual disputes concerning the location of Wright's gun after Deputy Ady wrestled it from him and threw it on the bed and whether Wright was looking at the gun during the encounter.  (*Id.* at 1872.)  As detailed above, it is undisputed Wright's gun was not in the bedroom at the time he was shot.  Deputy Ady testified, however, he believed the gun remained where he initially threw it away—so within Wright's reach when Wright got up from the bed and began moving toward Deputy Ady.  (Doc. 33-13 at 1480–81.)  Deputy Ady also testified he saw Wright look in the direction of the gun, increasing his suspicion that Wright planned to reach for it.  (Doc. 27-1 at 141.)  Plaintiff argues there is a fact issue over whether Deputy Ady "concocted" this version to justify the shooting because the body camera footage allegedly does not show Wright looking at any gun.  (Doc. 35 at 1873.)

Lastly, Plaintiff asserts there is a disputed fact relating to how quickly Wright approached the deputies after standing up in the bedroom.  (*Id.* at 1880.)  Plaintiff argues the body camera footage does not show Wright "quickly" advancing, as Defendants argue.  (*Id.*)

### C.  Procedural History

On November 30, 2022, Mrs. Wright[4] filed a complaint as administrator of the estate of Craig Wright.  (Doc. 1.)  The complaint named as defendants Deputy Ady, the Richland County Board of Commissioners, and Richland County (together, "Defendants").  (*Id.* at 1.)  The complaint stated two causes of actions: (1) a claim under 42 U.S.C. § 1983 (against all

---

[4] On October 9, 2023, Mrs. Wright withdrew as administrator of the estate of Craig Wright. (Doc. 20-3.)  Matthew Besser, as successor Administrator, was substituted as Plaintiff.  (Doc. 20.)

Defendants); and (2) an Ohio state law claim for wrongful death (against all Defendants).  (*Id.* at 7–8.)  While not pleaded particularly as such, Count One states a § 1983 excessive force claim against Deputy Ady in his personal capacity, and separately states a § 1983 claim against Richland County, Richland County Board of Commissioners, and Deputy Ady in his official capacity.  (*Id.*)

Defendants answered on March 27, 2023.  (Doc. 9.)  The case proceeded to discovery. On March 13, 2024, Defendants moved for summary judgment.  (Doc. 29.)  Plaintiff opposed on April 12, 2024.  (Doc. 35.)  On April 26, 2024, Defendants filed a reply.  (Doc. 37.)

## II.    LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted).  A "material" fact is one that "might affect the outcome of the suit under the governing law[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849–50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact."  *Queen v. City of Bowling Green*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  On summary judgment, the

inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).  A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) & (e).  Rule 56 further provides "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation and citation omitted).  The Court's role is not to make credibility determinations or "weigh" conflicting evidence.  *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014).  "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*

## III.   ANALYSIS

### A.   Asserted Disputes of Material Facts

The Court first addresses Plaintiff's arguments relating to alleged disputed facts.  *See Heeter v. Bowers*, 99 F.4th 900, 911 (6th Cir. 2024) ("Our first step in reviewing the constitutionality of [an officer's] use of force is to determine the relevant facts for our analysis.") (citation and quotations omitted).  "A party asserting that a fact . . . is genuinely disputed must support the assertion by [] citing to particular parts of materials in the record" or by showing "the

materials cited do not establish the absence or presence of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may [] consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(1)(2).

Plaintiff argues there is a genuine dispute of fact regarding whether Wright shot the gun. (Doc. 35 at 1869–70.)  To Plaintiff, Wright never fired the gun, and instead, the gun accidentally discharged.  (*Id.*)  Plaintiff argues the following evidence supports this theory.  First, the incident on the bed occurred while the body camera was obscured.  Thus, there is no video evidence of that exact moment.  (*Id.*)  Next, Deputy Pawlikowski testified he never saw a gun.  (Doc. 27-1 at 285.)  And neither the internal investigation nor the BCI investigation conclusively determined Wright fired the gun (though the BCI report at multiple times assumes Wright fired it).  (Doc. 31-1 at 1035.)  Lastly, Plaintiff argues when Deputy Ady conducted the takedown maneuver, Wright fell onto the bed and Deputy Ady fell on top of him.  (*Id.*)  Plaintiff argues this is the position the two were in during the entire struggle on the bed and that it is improbable Wright was able to grab a gun, twist is body around, and point it at the deputies.  (*Id.*)

In support of this theory, Plaintiff argues Deputy Ady's version of the events is a fabrication.  (Doc. 35 at 1869.)  Deputy Ady's testimony during his deposition, Plaintiff says, is contradicted by his statements to Captain Sweat during the internal investigation immediately following the shooting.  (*Id.*)  In his deposition, Deputy Ady testified:

Q:      So you see his right hand as it grabs the gun?

A:      Yes, sir.

Q:      Okay.  What happened next?

A:      He tries to kill me.

Q:     Okay.

A:     I mean, he grabbed the gun, and me and him are fighting with it. He's pointing it at my head, to the left, to the right, and then he, I guess maneuvered out his hand good enough to be away from my face and he pulled the trigger by my ear.

* * *

Q:     The way you described the struggle, when he was grabbing the gun, he was face down stomach and chest touching the bed.  Was he able at some point to maneuver his body so he was now turned around and facing you?

A:     Yes, sir.

* * *

Q:     Okay.  So you have this struggle with him, you see that he's got the gun in hand, he's able to turn around, he points the gun at you, he shoots and misses by hits your partner, right?

A:     Yes, sir.

(Doc. 27-1 at 162–64.)  In his statement to Captain Sweat, Deputy Ady stated:

When he landed on his bed I saw his arm reach underneath the pillow as I was watching his arm I seen [sic] a silver object which obviously looked like a gun.  At that time I screamed Gun to Ski.[5] . . . I proceeded to fight with him, Craig was able to take off a shot and hit Ski in his right arm.  When it hit in his right arm I'm stilling fighting Craig for the gun, I was successfully able to take it out of his hand.  I pushed him over and I hit him two times in the back of the head with his own gun.

(Doc. 34-4 at 1726.)  Plaintiff highlights the testimony from Deputy Ady where he stated Wright pointed the gun at his head and argues that Deputy Ady never said that in his statement to Captain Sweat.  From this, Plaintiff contends Deputy Ady contradicted himself and a jury could conclude Wright never grabbed the gun, never turned his body, and never shot the bullet.  (Doc. 35 at 1870.)

"In cases involving the use of deadly force, the deceased suspect is unable to tell what

---

[5] "Ski" is Deputy Pawlikowski's nickname.

occurred, and 'a court may not simply accept what may be a self-serving account by the police officer.  It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story.'"  *Hood v. City of Columbus*, 827 F. App'x 464, 470–71 (6th Cir. 2020) (quoting *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010)).  Moreover, the Sixth Circuit has stated that "[w]hen there is a video record of the incident, we take the facts as they appear in the video, which may not necessarily be in the light most favorable to the nonmoving party."  *Nelson v. City of Battle Creek*, 802 F. App'x 983, 985 (6th Cir. 2020) (citing *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)).  But "[a]ny remaining gaps or ambiguities in the facts as recorded in the video, however, are to be viewed in the light most favorable to the nonmoving party."  *Id.* at 986 (citing *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)).  With these specific considerations, a court must still decide whether "a reasonable jury—viewing the evidence in favor of the nonmovant—could decide for the nonmovant."  *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).  Under the summary judgment standard, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the plaintiff."  *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (citation and quotation omitted).

Here, there is no evidence disputing Deputy Ady's testimony of his struggle to wrestle the gun away from Wright.  Indeed, the body camera footage corroborates Deputy Ady's statement that a struggle for the gun occurred.  Deputy Ady's testimony here is not inconsistent with his statement to Captain Sweat.  Deputy Ady testified Wright grabbed the gun and was able to maneuver his body.  (Doc. 27-1 at 162.)  He reported the same thing to Captain Sweat when he explained he was able to take control of the gun and "pushed him over."  (Doc. 34-4 at 1726.)  The fact that the BCI report did not conclude Wright fired the gun, combined with the fact that

Deputy Pawlikowski never saw Wright fire the gun, does not present contradictory evidence in light of Deputy Ady's uncontradicted testimony.  Plaintiff's theory Wright did not shoot the gun is not supported by evidence, nor supported by the lack of evidence.  *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (a plaintiff cannot oppose summary judgment by "identify[ing] a metaphysical doubt or hypothetical plausibility based on lack of evidence; she is obliged to come forward with specific facts, based on discovery and disclosure of materials on file, and any affidavits, showing that there is a genuine issue for trial") (quotations and citations omitted).  While the Sixth Circuit has held "gaps or uncertainties" should be construed in the decedent's favor because their testimony might contradict or explain an officer's version of events, the Sixth Circuit has typically done so where there is evidence that calls into question that testimony.  *Heeter*, 99 F.4th at 912.  There is no such evidence here.

Plaintiff's other arguments relating to "disputed" facts are resolved by reviewing the video and other evidence in this case.  These facts are not truly disputed, but only characterized differently by the parties.  For instance, Plaintiff claims Wright did not "quickly" advance on the deputies.  But the video plainly reveals Wright advanced on Deputy Ady despite repeated orders to stop.  Plaintiff's other argument regarding Wright looking at the gun does not reveal a dispute about a material fact.  Whether the firearm remained in the room after Deputy Ady tossed it away does not change the qualified immunity analysis discussed below.

### B.  Section 1983 Claim Against Deputy Ady in his Personal Capacity

Plaintiff brings an excessive force claim under § 1983 for Deputy Ady's fatal shooting of Wright.  (Doc. 1 at 7.)  Deputy Ady argues he is entitled to qualified immunity, and thus, summary judgment on this claim.  (Doc. 29 at 811.)

"Qualified immunity shields an officer from liability 'insofar as his conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stewart v. City of Euclid*, 970 F.3d 667, 672 (6th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The qualified immunity analysis has two steps: "(1) whether the public official's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the events." *Id.*  Here, Plaintiff alleges Deputy Ady violated the Fourth Amendment by using excessive force.

"The Fourth Amendment guarantees the right to be free from unreasonable seizures.  This includes the right to be free from excessive force." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (citing *Graham v. O'Connor*, 490 U.S. 386, 388 (1989)).  There is no dispute that the shooting of Wright was a seizure.  The disputed question is whether that seizure was reasonable, and thus, constitutional.[6]

"The Fourth Amendment's 'objective reasonableness' standard governs whether an officer's force was excessive." *Id.* (citing *Graham*, 490 U.S. at 388).  In *Graham*, the Supreme Court instructed courts to consider (1) "the severity of the crime at issue," (2) "whether the suspect pose[]d an immediate threat to the safety of the officers or others," and (3) "whether [the suspect was] actively resisting arrest or attempted to evade arrest by flight." *Graham*, 490 U.S. at 396.  In deadly forces cases, "[d]eadly force is objectively reasonable when an officer 'has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Thomas*, 854 F.3d at 365 (quoting *Tenn. v. Garner*, 471 U.S. 1, 3 (1985)).  "When considering whether an officer reasonably believed that a person posed an imminent threat of serious bodily harm, courts must consider the totality of the circumstances."

---

[6] Deputy Ady does not argue any right potentially at issue was not clearly established.  Thus, the only issue presented by the summary judgment papers is whether Deputy Ady's conduct violated a constitutional right.

*Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022).  "[T]he critical factor is whether the suspect presented an immediate danger to the officers or others."  *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020).

In conducting this analysis, a court must "analyze an officer's decision to use force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Thomas*, 854 F.3d at 365 (quoting *Graham*, 490 U.S. at 396).  As the Sixth Circuit has repeatedly emphasized, courts must be "mindful that police officers face 'tense, uncertain, and rapidly evolving' situations that require 'split-second judgments.'  The Fourth Amendment only requires officers to act reasonably on the information they have; it does not require them to perceive a situation accurately."  *Id.* (internal quotations and citations omitted).

With these considerations in mind, the Court turns to each *Graham* factor.

### 1.    Severity of the Crime at Issue

When Deputy Ady and Deputy Pawlikowski first responded to Wright's home, there was no crime at issue.  Instead, the deputies were there to conduct a wellness check.  However, the situation escalated after Wright drew a gun and struggled with Deputy Ady.  At that point, the crime at issue was severe.  *See Bell v. Cumberland Cnty.*, 665 F. App'x 421, 426 (6th Cir. 2016) (finding the crime at issue severe where initial crime was minor but evolved into severe crime).  Plaintiff concedes this factor weighs in favor of finding Deputy Ady's use of deadly force reasonable.  (Doc. 35 at 1881.)

### 2.    Imminent Threat of Serious Bodily Harm

This factor is the most important factor in deadly force cases.  *Hicks*, 958 F.3d at 435.  In considering the totality of the circumstances, courts must "measure the reasonableness of the use of deadly force at a particular time based on an 'objective assessment of the danger a suspect

poses *at that moment*.'" *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting

*Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007)).[7]  In deadly force cases, the Sixth

Circuit has instructed courts to consider other non-exhaustive factors in assessing whether an

officer reasonably believed that a person posed an imminent threat of serious bodily harm:

> (1) why the officer was called to the scene; (2) whether the officer knew or
> reasonably believed that the person was armed; (3) whether the person verbally or
> physically threatened the officer or disobeyed the officer; (4) how far the officer
> was from the person; (5) the duration of the entire encounter; (6) whether the officer
> knew of any ongoing mental or physical health conditions that may have affected
> the person's response to the officer; and (7) whether the officer could have diffused
> the situation with less forceful tactic.

*Palma*, 27 F.4th at 432 (internal citations omitted).

Plaintiff argues there was no imminent threat when Deputy Ady shot Wright.  (Doc. 35 at

1878.)  Plaintiff agrees after Wright's gun discharged and struck Deputy Pawlikowski, Deputy

Ady would have been entitled to respond with deadly force (and Plaintiff does not contend

Deputy Ady's conduct in striking Wright with the butt of his gun constituted excessive force).

(*Id.* at 1879.)  However, Plaintiff argues the situation de-escalated over the approximately 30

seconds Wright was apparently unconscious and then the additional five minutes where Wright

kneeled and rose to his feet.  (*Id.*)  At that point, Plaintiff contends, Deputy Ady no longer was

justified in using deadly force and was required to use less than lethal force.  (*Id.*)  The Court

takes each *Palma* consideration in turn.

---

[7] The Supreme Court is currently considering a use-of-force case and the "at the moment"
standard used by some circuits.  *See Barnes v. Felix*, 91 F.4th 393 (5th Cir. 2024), *on appeal*, No.
23-1239 (argued Jan. 22, 2025).  Here, imminency is satisfied whether the test is "at the
moment" or can include events immediately prior to the use of force.  After having drawn a
weapon that resulted in another deputy being shot, Wright only ceased being defiant and
physically threatening during the 30 seconds he was unconscious on the bed.

### i.        Why Deputy Ady Was Called to the Scene

"When officers are called for wellness checks or other non-criminal calls, this Court looks at what the officer learned and observed about the situation before the officer even engaged with anyone on the scene." *Palma*, 27 F.4th at 432.  Here, the deputies were dispatched to conduct a wellness check.  (Doc. 27-1 at 146.)  Dispatch reported there was a potentially suicidal person in the home.  (*Id.*)  There was no mention of any firearms or other violent behavior reported.  (Doc. 27-2 at 275.)  Because this was not a situation where the deputies had any reason to fear for their safety before arriving on the scene, this consideration weighs in favor of finding no imminent danger.

### ii.        Whether Deputy Ady Knew or Reasonably Believed Wright Was Armed

Wright was not armed at the time Deputy Ady shot him.  (Doc. 35 at 1872; Doc. 37 at 1903.)  It is also undisputed Deputy Ady knew Wright was unarmed at the time of the shooting.  (Doc. 27-1 at 140.)  This consideration weighs in favor of finding no imminent danger.

### iii.        Verbal Threats or Disobeying

"When a person does not act 'aggressively' towards an officer, that fact undermines the officer's claim that the person presented an immediate threat of serious bodily harm." *Palma*, 27 F.4th at 434 (quoting *Stewart*, 970 F.3d at 673–74).  To be sure, "deadly force is not justified 'whenever a suspect charges at an officer or defies an order.'"  *Id.* at 435 (quoting *Mitchell v. Schlabach*, 864 F.3d 416, 424 (6th Cir. 2017)).  But where a party displays potentially violent behavior and a "willingness to put lives at risk," this consideration will weigh in favor of the use of deadly force.  *Mitchell*, 864 F.3d at 424.

First, it is undisputed Wright verbally threatened the deputies.  On multiple occasions, Wright yelled expletives at the deputies and raised his middle finger.  (Doc. 36 at 23:20:46–

23:21:06; 23:21:08; 23:21:29.)  Before moving towards Deputy Ady, Wright exclaimed that he "was not going to jail."  (*Id.* at 23:22:52.)  In the context of this encounter—after Wright went for and shot his gun—these actions were clear threats.

Second, it is also undisputed Wright failed to comply with dozens of commands. Throughout the encounter, Deputy Ady issued various commands and Wright ignored all of them.  From telling Wright to not move, to not stand up, to get on the ground, to stop talking, to relax, Wright failed to comply with a single command.  (*See, e.g.*, *id.* at 23:19:00–23:19:38; 23:20:06; 23:22:25; 23:22:48–23:22:50.)

Lastly, the particular facts of this case also weigh in favor of finding Wright was potentially violent.  Namely, Wright's willingness to grab a gun, wrestle with Deputy Ady for control of the gun, and ultimately fire the gun, striking Deputy Pawlikowski.  Further, Wright's conduct indicated to the deputies he was not going to leave the room without violence.  Under the facts of this case, Wright clearly demonstrated a willingness to be violent.  Therefore, Deputy Ady was justified in believing Wright posed a continuing threat because of these violent actions.

In *Mitchell*, the Sixth Circuit held that an officer was entitled to qualified immunity because, in part, the officer was faced with an individual who displayed a willingness for violence after leading an officer on an erratic and dangerous car chase.  *Mitchell*, 864 at 424. The suspect, who was unarmed, then crashed his vehicle and aggressively approached the officer, yelling expletives.  *Id.* at 419.  The Sixth Circuit held in "the factual context of a car chase involving a single officer, isolated from backup, who was charged by a suspect who had demonstrated a willingness to put lives at risk in order to evade arrest," the officer could reasonably fear the suspect posed a serious threat to his safety.  *Id.* at 424.  So too here.  Wright's initial violent interaction with Deputy Ady, combined with his conduct in the confines of a small

room, all while Deputy Ady was alone protecting an injured officer, all indicate this consideration weighs in favor of finding Wright posed an immediate risk of harm to the deputies.

### iv.       Distance Between Deputy Ady and Wright

This factor is more important where the officer "is afraid of hand-to-hand confrontation with the person." *Palma*, 27 F.4th at 435 (citing *Zulock v. Shures*, 441 F. App'x 294, 302 (6th Cir. 2010)).  That is, this factor is more significant where the suspect does not have a firearm which they can aim and shoot. *Id.* (citing *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 429 (6th Cir. 2006)).  On the other hand, if a suspect has a firearm, distance between the suspect and officers will not weigh heavily since the suspect could inflict harm at even great distances.

Here, Wright ignored Deputy Ady's commands and moved to within five to seven feet of Deputy Ady.  (Doc. 27-1 at 159; Doc. 27-5 at 435.)  All of this occurred in a small bedroom. (Doc. 36 at 23:17:44–50.)  Because Wright moved off and around the bed, nothing in the room blocked Wright from closing the gap between him and Deputy Ady.  (*Id.* at 23:22:34.)  As the Sixth Circuit has noted, "[a]n assailant can close a [25 to 36 foot distance] in a second or two." *Reich v. City of Elizabethtown*, 945 F.3d 968, 981–82 (6th Cir. 2019).  Here, the close proximity posed an increased risk of a serious and imminent injury.

In *Mitchell*, the Sixth Circuit found that where a suspect aggressively approached an officer, closing a sixty foot gap to a ten to twenty foot gap, the use of deadly force was appropriate.  *Mitchell*, 864 F.3d at 423.  There, the Sixth Circuit found that if the suspect took "one more step," it "would have placed [the suspect] in a position to attack [the officer] with his fists." *Id.*  In contrast, in *Palma*, there was conflicting testimony regarding how far away the suspect was and whether the suspect was ever able to get close enough to the officer.  27 F.4th at 436.  Thus, the distance in that case did not support the officer's use of deadly force.  What is

more, in this case, unlike both *Mitchell* and *Palma*, the events took place inside a small bedroom, not out in the open. *See Chappell*, 585 F.3d at 911 (finding that the incident occurred in a "small bedroom" with a distance of five to seven feet with no barriers between officers and suspect weighed in favor of use of force). While the suspect in *Chappell* was wielding a weapon—a knife—the location of the incident weighed in favor of finding the officer's belief of immediate serious harm reasonable.

This consideration weighs in favor of finding Wright posed an immediate risk of harm to the deputies.

### v. Duration of the Encounter

This consideration weighs in favor of the use of force when a situation "unfolds quickly" and is accompanied by "a credible threat to the safety of an officer or the public." *Palma*, 27 F.4th at 436 (citing *Mitchell*, 864 F.3d at 423). On the contrary, it weighs against the use of force where the incident unfolds over an amount of time that gives officers time to "assess and react to a situation." *Id.* (citing *Untalan v. City of Lorain*, 430 F.3d 312, 316 (6th Cir. 2005)). Where an officer faces a rapidly evolving situation and must make a split-second judgment, courts weigh this consideration in favor of finding the use of force reasonable. *Graham*, 490 U.S. at 396.

The entire encounter lasted just over seven minutes. The Sixth Circuit has found where a situation unfolded over the court of ten minutes weighed against the use of deadly force. *Untalan*, 430 F.3d at 316 (indicating that deadly force is less reasonable when officers have ten minutes to assess and react to a situation). In *Palma*, the Sixth Circuit similarly found "[i]f the incident lasted eight to ten minutes, then the amount of time [the officer] had to react to [plaintiff] would not justify his use of lethal force." 27 F.4th at 436. In *Palma*, there was no

specific moment in time where the officer had to make a split-second choice. *See id.* ("If [the officer] had eight to ten minutes to assess and respond to a situation that never rapidly escalated, the use of lethal force would be unreasonable.").

Here, after the initial shooting and while Deputy Ady was still physically struggling with Wright on the bed, Deputy Ady made a split-second decision to disarm Wright. No party disputes the initial use of force. Thirty seconds passed while Wright was unconscious. Another four minutes and 30 seconds passed before Wright began approaching Deputy Ady. No force was used during that time. Instead, Deputy Ady assessed the severity of Deputy Pawlikowski's gunshot wound, requested backup and emergency medical services, and maintained his visual on Wright while commanding him to remain still.

The time between Wright approaching Deputy Ady and the discharge of Deputy Ady's service weapon was a matter of seconds. The situation escalated as Wright continued to approach Deputy Ady saying he would not be arrested and should be shot. Wright stood up from the bed and moved so that he was in a direct line to Deputy Ady without any obstructions. (Doc. 36 at 23:22:36–39.) Thirteen seconds later, as Wright continued to ignore commands, he made his approach, now getting within five to seven feet of Deputy Ady. (*Id.* at 23:22:52.) Over this short period of time, the circumstances quickly changed. Deputy Ady was required to make a split-second decision. This factor ultimately weighs in favor of the use of force.

### vi.     Mental Health Considerations

"When assessing an excessive force claim, 'the totality of the circumstances includes the fact that at the time of the . . . struggle, the defendant officers had reason to believe that the person was . . . mentally unstable.'" *Palma*, 27 F.4th at 436 (quoting *Roell v. Hamilton Cnty.*, 870 F.3d 471, 482 (6th Cir. 2017)). "[I]f the officer knows that person is suffering from some

mental illness, the officer must consider this fact and respond accordingly," recognizing that some "behavior that ordinarily seems threatening may present a lower risk of harm if the officer has reason to believe that the behavior is a symptom of a mental condition." *Id.* at 437. That is, "behavior that ordinarily seems threatening may present a lower risk of harm if the officer has reason to believe that the behavior is a symptom of a mental condition." *Id.* Depending on the circumstances of the particular case, "mental illness may mitigate the risk in one situation and aggravate the risk in another." *Id.* at 438.

Here, Deputy Ady was told Wright was suffering from a mental health issue. (Doc. 27-1 at 146.) Deputy Ady knew Wright was potentially suicidal, and within moments of interacting with Wright, believed he was intoxicated. (*Id.* at 155.) Neither of these facts, however, mitigates the threat posed to officers and others in the home. Wright's mental state may explain some of his conduct, but it does not mitigate the escalating threat presented here. Wright wrestled with an officer for a gun that discharged and hit another officer. He ignored commands to remain on the bed. He approached Deputy Ady and put himself within five to seven unobstructed feet of Deputy Ady. Even recognizing the fluctuating dynamics and sensitive considerations present when an individual is in crisis, an officer's use of force is justified if the person presents an ongoing and escalating threat of serious physical harm. *See Mullins*, 805 F.3d at 767.

### vii.        Readily Available Alternatives

"Sometimes, the time or space available to an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover." *Palma*. 27 F.4th at 439 (quoting *Thomas*, 854 F.3d at 366–67). Citing to the Third Circuit, the *Palma* court held:

> Depending on the severity and immediacy of the threat and any potential risk to
> public safety posed by an officer's delayed action, it may be appropriate for an

> officer to retreat or await backup when encountering a mentally disturbed
> individual. It may also be appropriate for the officer to attempt to de-escalate an
> encounter to eliminate the need for force or to reduce the amount of force necessary
> to control an individual.

*Id.* (quoting *Johnson v. City of Philadelphia*, 837 F.3d 343, 353 (3d Cir. 2016)). At the same time, the Sixth Circuit has recognized that a rapidly evolving situation which requires split-second judgments limits the ability of officers to use other, less lethal alternatives. *Mitchell*, 864 F.3d at 423. Further, "[t]he Fourth Amendment does not require that officers expose themselves to a plausible risk of bodily injury to avoid using non-deadly force against an armed assailant, much less to grapple with them for control of the weapon." *Estate of Erwin v. Greene Cnty.*, 861 F. App'x 1, 6 (6th Cir. 2021).

Plaintiff contends Deputy Ady did not need to discharge his service weapon. (Doc. 35 at 1885.) To him, Deputy Ady could have used pepper spray or his taser. (*Id.*) Plaintiff further asserts the amount of time between the initial shooting on the bed and the shooting as Wright approached Deputy Ady—approximately five minutes in total—creates a fact issue for the jury, namely whether Deputy Ady had other options available to him to mitigate the threat. (*Id.*)

Plaintiff's arguments regarding readily available alternatives do not create a jury question. After Deputy Ady wrestled Wright's gun away from him, Deputy Ady retreated to the doorway and unholstered his service weapon. While Wright was laying on the bed, Deputy Ady communicated with dispatch and checked on Deputy Pawlikowski. At that point, Deputy Ady was waiting for backup. Deputy Ady's service weapon was clearly visible as Wright defied commands and stood up from the bed. When Wright got within five to seven feet of Deputy Ady, Wright could have easily moved to wrestle the gun from Deputy Ady's hands. And, although Deputy Ady incorrectly believed the Wright's own gun was on the floor and within Wright's reach as he approached, Deputy Ady's mistaken belief was reasonable since Deputy

Ady had thrown Wright's gun near that location.  *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008) ("what is a 'reasonable' belief could also be a mistaken belief, and that the fact it turned out to be mistaken does not undermine its reasonableness as considered at the time of the acts").

These facts do not create a jury question.  It would be unreasonable and out of line with precedential case law to say that Deputy Ady needed to re-holster his weapon and draw a taser or pepper spray as Wright ignored commands and continued to advance.  *Palma*, 27 F.4th at 440 (once an officer "unholsters his gun during an encounter, it may be unreasonable to expect him to swap out the gun for a less lethal tool") (citing *Mitchell*, 864 F.3d at 423).

### viii.        Balancing *Palma* Considerations

"A suspect need not be armed to pose an imminent threat to an officer's safety." *Mitchell*, 864 F.3d at 422–23.  And "an officer need not face the business end of a gun to use deadly force."  *Palma*, 27 F.4th at 433.

In *Mitchell*, the Sixth Circuit found a suspect posed an immediate threat to the safety of an officer where the suspect's prior violent behavior, including evasion of arrest and driving at speeds exceeding 100 mph, combined with aggressively approaching the officer despite commands to stop.  864 F.3d at 422.  Even though the suspect was unarmed, the evidence established the officer reasonably believed he was in danger of serious physical harm.  *Id.*  The Sixth Circuit explained the officer "reasonably feared for his safety despite the fact that [the suspect] may have been unarmed—[the suspect's] aggressive approach suggested that he might well have attacked [the officer] with his fists, or that he might have tried to wrestle for control of [the officer's] gun so that he could use it against the officer."  *Id.* at 423.

In contrast, in *Palma*, the Sixth Circuit determined an unarmed suspect did not pose an

imminent threat to an officer's safety. 27 F.4th at 440. There, police responded to a 911 call about an unwanted person at a home. *Id.* at 424. When police arrived, the suspect was on the porch of the home and unresponsive to any commands from the officer. *Id.* The suspect began to approach (with conflicting testimony from witnesses about how fast or aggressive the approach was) and the officer used his taser three times. *Id.* After the suspect continued to approach (again with conflicting testimony), the officer shot him multiple times, killing him. *Id.* The Sixth Circuit held the suspect did not pose an immediate threat to the officer's safety. *Id.* at 440. The officer continued to retreat for eight to ten minutes without continued confrontation from the suspect. *Id.* at 436. The circumstances of the encounter did not indicate the suspect was violent.

This case is more like *Mitchell* than *Palma*. As in *Mitchell*, Deputy Ady faced a suspect who demonstrated a willingness to be violent. Though not armed at the time of the shooting, just minutes prior Wright grabbed his own gun, fought with Deputy Ady, and another officer suffered a gunshot wound. Despite repeated commands from Deputy Ady, Wright continued to approach Deputy Ady and, ultimately, left only five to seven feet between them. (Doc. 27-1 at 159; Doc. 27-5 at 435.) Wright could have closed the gap in mere seconds and with a few short steps. *Reich*, 945 F.3d at 981–82 ("An assailant can close [a 25 to 36 foot] distance in a second or two."). As he advanced, Wright said he "was not going to jail." (Doc. 36 at 23:22:52.)

Not surprisingly, Plaintiff contends that a jury could conclude Deputy Ady's use of lethal force was unjustified. Each contention is addressed below.

First, Plaintiff argues that while the deputies might have been entitled to use force after the initial shooting, the situation de-escalated thereby giving Deputy Ady time to consider less lethal options. (Doc. 35 at 1878–79.) Plaintiff relies on cases where courts concluded deadly

force was not justified because the confrontation deescalated.  *See, e.g.*, *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005).  Those cases are inapplicable here because each involved situations where the suspect no longer posed any threat of imminent harm—the suspect was either surrendering or had been rendered non-threatening due to officer involvement.  These cases may be relevant if Deputy Ady had shot Wright immediately after the initial shooting or seconds thereafter.  But that is not the situation here.  Wright ignored commands, continued to advance, and declared they would not be taking him to jail.  Unlike the plaintiffs in the cases cited by Plaintiff, Wright posed an ongoing and escalating threat when Deputy Ady fired his service weapon.

Second, Plaintiff disputes the location of the gun and whether Wright was looking at the gun as he advanced.  (Doc. 35 at 1879.)  In essence, Plaintiff argues Wright was not looking at a gun and there was no weapon within Wright's reach.  (*Id.* at 1880.)  As explained above, Deputy Ady's reasonable mistaken belief does not preclude summary judgment.  *Davenport*, 521 F.3d at 552.  Further, whether Wright was looking at a gun, as Deputy Ady testified, is certainly one factor the Court considers.  However, it would not be definitive.  Disregarding that fact altogether, the facts still establish an objectively reasonable belief that Wright posed an imminent risk of serious bodily harm at the time of the fatal shooting.

Plaintiff also argues that Wright did not "quickly" advance on Deputy Ady.  (Doc. 35 at Doc. 35 at 1880.)  Again, even if Wright did not move "quickly," these facts remain: he drew a weapon on deputies, struggled with a deputy for the gun, the gun went off, he ignored commands, and advanced on Deputy Ady despite repeated commands to stop.  All of this occurred within four minutes and 30 seconds.  All of this occurred in a small bedroom.  That Wright's advance may have been more consistent than it was quick does not create a genuine issue of material fact.

### 3. Actively Resisting Arrest or Evading Arrest

Plaintiff contends this factor weighs "heavily" in his favor because Deputy Ady did not put Wright under arrest or attempt to do so and Wright was not trying to flee.  (Doc. 35 at 1881.)  The record does not support this conclusion.

Deputy Ady explained in his deposition because they were called to the house for a wellness check, Wright was not under arrest and Deputy Ady only sought to detain him to assess whether Wright needed medical attention.  (Doc. 27-1 at 229.)  As Deputy Ady explained, there was no arrestable offense at that time.  (*Id.*)  But when Wright drew a gun and fought with Deputy Ady, there was an arrestable offense.  Further, Deputy Ady issued dozens of commands to Wright, including commands to remain still, get on the ground, and stop moving.  Wright did not listen to these commands, rose to his feet, and approached the deputies while saying they would not be taking him to jail.  Wright was actively resisting arrest.  This factor weighs in favor of finding the use of force objectively reasonable.

In balancing all of the above factors and considerations, the Court finds Deputy Ady's use of lethal force was objectively reasonable.  Deputy Ady is entitled to qualified immunity.

### C. Section 1983 Claim Against Richland County, Richland County Board of Commissioners, and Deputy Ady in his Official Capacity

Count One asserts a § 1983 claim against Richland County, Richland County Board of Commissioners, and Deputy Ady in his official capacity.  (Doc. 1 at 7–8.)

"[U]nder § 1983, local governments are responsible only for their own illegal acts.  They are not vicariously liable under § 1983 for their employees' actions."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citations and internal quotation marks omitted).  "Instead, a municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have

'cause[d]' one of its employees to violate the plaintiff's constitutional rights."  *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)).  Thus, a plaintiff must show (1) a violation of constitutional rights; and (2) the municipality's policy or custom led to the violation.  *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).  "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

"There is no liability under *Monell* without an underlying constitutional violation." *Zucker v. City of Farmington Hills*, 643 F. App'x 555, 570 (6th Cir. 2014) (citing *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)).  Since there is no underlying constitutional violation, Plaintiff's *Monell* claim similarly fails.

Even if there were a constitutional violation, Plaintiff has not properly presented a *Monell* theory of liability.  In the complaint, Plaintiff alleged failure to provide adequate training or policies regarding mentally ill citizens.  (Doc. 1 at 7–8.)  While Plaintiff's briefing discusses some of these issues in the fact section (Doc. 35 at 1874), Plaintiff primarily argues a ratification theory on summary judgment (*id.* at 1885–87).  Specifically, Plaintiff argues Sheriff Sheldon ratified Deputy Ady's unconstitutional conduct by approving the report which found Deputy Ady did not violate any laws, rules, or policies.  (*Id.* at 1886.)  Thus, Plaintiff argues he demonstrated RCSO's policy of allowing deputies to use excessive force.  (*Id.*)  RCSO's unlawful conduct is

also supported by the "sham" use of force reports, Plaintiff urges.  (*Id.* at 1887.)

As an initial matter, Plaintiff's summary judgment briefing only argues an improper ratification theory of *Monell* liability, not an inadequate training theory.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).  To the extent Plaintiff addresses an inadequate training theory, that argument is not properly addressed.  *Id.* (arguments presented "in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Plaintiff's general reference to an inadequate training theory in the fact section is unsupported by argument or case law.  Thus, it is waived.

And although the ratification theory of *Monell* liability is sufficiently addressed in the summary judgment briefing, Defendants rightly point out Plaintiff did not plead a ratification theory in the complaint.  (*See* Doc. 37 at 1904.)   Plaintiff cannot "expand its claims to assert new theories" "in response to summary judgment."  *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007); *see also Tucker v. Union on Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.  At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).").

Defendants' motion for summary dismissal of the *Monell* claim is granted.

### D.      Ohio Law Wrongful Death Claim

Under R.C. § 2125.01, "[w]hen the death of a person is caused by wrongful act . . . the person who would have been liable if death had not ensued . . . shall be liable to an action for damages[.]"  R.C. § 2125.01.

Richland County and Richland County Board of Commissioners argue summary

judgment must be granted because each entity is entitled to statutory immunity under R.C. § 2744.02(A)(1).  (Doc. 29 at 822–23.)  Under R.C. § 2744.02(A)(1), "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."  R.C. § 2744.02(A)(1).  Plaintiff agrees pursuant to R.C. § 2744.02(A)(1) Richland County and Richland County Board of Commissioners have statutory immunity from this claim.  (Doc. 35 at 1887.)  Accordingly, summary judgment on Count Two is granted as to Richland County and Richland County Board of Commissioners.

Deputy Ady argues he is entitled to statutory immunity under R.C. § 2744.03(A)(6). Under R.C. § 2744.03(A)(6), an employee of a political subdivision is immune from liability unless the "employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities" or the "employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."  R.C. §§ 2744.03(A)(6)(a), (b).  The parties agree that whether Deputy Ady is entitled to statutory immunity under R.C. § 2744.03(A)(6) turns on whether Deputy Ady is entitled to qualified immunity under federal law. (Doc. 29 at 823; Doc. 37 at 1906.)  The Sixth Circuit has held a defendants' "statutory immunity defense [under R.C. § 2477.03(A)(6)] stands or falls with their federal qualified immunity defense."  *Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir. 2018).

Because the Court found Deputy Ady is entitled to federal qualified immunity, the Court finds Deputy Ady is entitled to statutory immunity under R.C. § 2477.03(A)(6).

**IV.     CONCLUSION**

For the reasons above, Defendants' Motion for Summary Judgment (Doc. 29) is

GRANTED in its entirety.


**IT IS SO ORDERED.**


Date:   March 19, 2025

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE